UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

Constance Hines and Marshay Hines,

Plaintiffs,

-v.-                                                    1:06-CV-01517
                                                        (NPM)

The City of Albany; *Albany Chief of
Police* James W. Tuffey; *Assistant
Chief* Steven Krokoff; *and Officers*
Brian Quinn, Jeff Roberts, John Monte,
Alfred Martin, Brian Plante, Robert
Mulligan, Tim Haggerty, Jeffrey Hyde,
Robert Shunck, *and* Michael Haggerty,

Defendants.

APPEARANCES:                              OF COUNSEL:

COOPER ERVING & SAVAGE LLP                PHILLIP G. STECK, ESQ.
Attorneys for plaintiffs                  KIMBERLY G. FINNIGAN, ESQ.
39 North Pearl Street
4th Floor
Albany, NY 12207

OFFICE OF THOMAS MARCELLE                 THOMAS MARCELLE, ESQ.
Attorney for plaintiffs
2 E-Comm Square
3rd Floor
Albany, NY 12207

REHFUSS, LIGUORI &                        STEPHEN J. REHFUSS, ESQ.
  ASSOCIATES, P.C.
Attorneys for defendants
40 British American Blvd.
Latham, NY 12110

Neal P. McCurn, Senior District Judge

### AMENDED[1] MEMORANDUM, DECISION AND ORDER

## I.  Introduction

Presently before the court in this civil rights action are cross motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Defendants seek summary judgment dismissing the entire complaint.  Plaintiffs oppose and cross move for summary judgment on their second cause of action. Defendants oppose and both parties have submitted their respective reply papers. Decision on the pending motions is based entirely on the submitted papers, without oral argument.  For the reasons that follow, defendants' motion is granted in part and denied in part, and plaintiffs' motion is granted in part and denied in part.

## II.  Procedural Background

Plaintiffs Constance Hines and her daughter, Marshay Hines ("Plaintiffs") bring this civil rights action pursuant to 42 U.S.C. § 1983, alleging that the defendants violated rights guaranteed them by the Fourth, Fifth and Fourteenth Amendments to the United States Constitution.  Defendants are the City of Albany ("the City"); the Albany Chief of Police, James W. Tuffey ("Tuffey"); Assistant Chief of Police, Steven Krokoff[2] and ten named Albany Police Department ("APD") officers.

---

[1] This Memorandum, Decision and Order is amended solely as to the final paragraph directing the issues to be tried.  Time to appeal and/or seek reconsideration shall commence as of the date of the filing of this Amended MDO.

[2] Plaintiffs ask that defendant Krokoff be dismissed from this action, as the evidence does not support their claims against him.  See Pls.' Mem. of Law at 10, n.4, Dkt. No. 77-2. Accordingly, any and all of Plaintiffs' claims against Krokoff in this action are dismissed with prejudice.

By their Second Amended Complaint,[3] Plaintiffs set forth claims against the City pursuant to Monell v. Dep't of Soc. Serv. of the City of New York, 436 U.S. 658, 694-95, 98 S.Ct. 2018, 2037-38 (1978), as well as claims against the individual defendants based on two separate constitutional violations.  First, Plaintiffs allege that all defendants except Michael Haggerty ("M. Haggerty") violated their Fourth and Fourteenth Amendment rights when they were held for approximately eight hours pending the application for a search warrant.  Second, plaintiff Constance Hines alleges that all defendants violated her Fourth, Fifth and Fourteenth Amendment rights when they seized her vehicle without probable cause and without a warrant, and when they subsequently failed to provide her with a hearing or any kind of process to determine whether the vehicle should be returned to her or retained by the City.

### III.  Factual Background

The following facts, relevant to the two claimed constitutional violations, are undisputed unless otherwise noted.[4]

---

[3]  This court previously granted a motion to amend the complaint and granted in part and denied in part a Fed. R. Civ. P. 12(b)(6) motion to dismiss the complaint.  See Hines v. City of Albany, 542 F.Supp.2d 218 (N.D.N.Y. 2008).  Plaintiffs amended their complaint a second time, upon consent of defendants as well as permission of Magistrate Judge Randolph F. Treece.  See Dkt. No. 66.  Familiarity with the original and first amended complaints is presumed.

[4]  The court notes that statements of fact have been submitted regarding several issues that are not material to the claims in this action.  Plaintiffs' second amended complaint clearly alleges constitutional violations based on the illegal seizure of Plaintiffs pending execution of the warrant to search their home and the illegal seizure of Constance Hines's vehicle and subsequent failure to provide due process regarding the forfeiture of same.  Thus, any evidence regarding, for example, whether or not defendants failed to knock before entering Plaintiffs' home, whether Marshay was injured during the execution of the arrest warrant, and whether defendants seized Plaintiffs' safe without cause or warrant, are immaterial to the pending claims and will not be considered.  Moreover, to the extent Plaintiffs seek to further amend their complaint at this late stage of the litigation, after Defendants have filed a motion for summary judgment and would not have the benefit of discovery on the new claims, the court denies same.  See Zuk v. Onondaga County, No. 5:07-CV-732, 2010 WL 3909524, at *21 (N.D.N.Y. Sept. 30, 2010).

In or around September 2005, the New York State Office of the Attorney General's Organized Crime Task Force ("OAG"), the New York State Police ("the State Police") and APD commenced a multi-agency investigation into the distribution and sale of illegal narcotics within the Albany, New York area. The OAG was the lead agency in this investigation and was responsible for the criminal prosecutions incurred as a result of the investigation. One of the targets of the investigations was Prince Hines, also known as "J-Rock." Prince resided at 38 Osborne Street in Albany along with his mother and sister, plaintiffs Constance and Marshay Hines.

### A. Seizure of Constance Hines's Vehicle

Constance Hines owned a 2000 Cadillac Escalade ("Escalade" or "vehicle") that was registered in her name. According to Defendants, Prince Hines "was a known drug dealer in [Albany] and often conducted his illegal activity from" the Escalade. Defs.' Statement of Material Facts ("SOMF") ¶ 7, Dkt. No. 71-2. Defendants further allege that "the Escalade was widely known throughout the community as Prince's vehicle." Id. ¶ 9. Plaintiffs dispute that the evidence establishes that Prince was conducting illegal activity from the vehicle, and further argue that the evidence Defendants cite to support their latter assertion is based on "inadmissible hearsay and opinion without any supporting foundational evidence." See Pls.' Resp. to Defs.' SOMF ¶¶ 7, 9, Dkt. No. 77-7.

Defendants cite deposition testimony of John W. Dormin ("Dormin"), who was the Assistant Deputy Attorney General that was assigned to prosecute the criminal charges against Prince Hines. See Dep. of John W. Dormin, May 28, 2009, 5:7-17; 61:3-11, at Ex. A to Aff. of Phillip G. Steck, Oct. 9, 2009, Dkt. No. 77 ("Steck Aff."). Dormin explained the basis of targeting the Escalade for seizure:

4

> Prince Hines used the [] Escalade throughout this
> conspiracy as his main mode of transportation.  As I
> testified earlier, this conspiracy transported drugs
> through vehicles primarily.  There was a prior arrest of
> Mr. Hines in that vehicle, in possession of narcotics.
> There were observations – I recall being told of
> observations by various investigators of Mr. Hines
> using the vehicle or moving about in the conduct of this
> drug conspiracy in the vehicle.

Dormin Dep., 59:17-60:7.  Clearly, Dormin's testimony is, in part, hearsay, insofar as it is offered to support Defendants' factual assertion that the Escalade was known throughout the community as Prince's vehicle and was used by Prince to conduct illegal activity in furtherance of the conspiracy.  Also, Dormin does not provide the foundation for his opinion that Prince used the Escalade throughout this conspiracy as his main mode of transportation.  Thus, by itself, the submitted testimony of Dormin would be inadmissible to support the Defendants' factual assertion.

Defendants' also cite deposition testimony from defendant Jeff Roberts ("Roberts") that throughout his surveillance of Prince Hines as well as his presence in the neighborhood working other cases, he regularly saw Prince driving the Escalade.  See Dep. of Jeffrey Roberts, Apr. 8, 2009, 10:18-11:8, at Ex. X to Aff. of Stephen J. Rehfuss, Aug. 14, 2009, Dkt. No. 71 ("Rehfuss Aff.").  Further, Constance Hines testified that between September 2005 and April 2006, Prince would have control of the Escalade during the day once or twice per week.  See Dep. of Constance Inger Hines, Mar. 26, 2009, at Ex. B to Steck Aff. and Ex. HH to Rehfuss Aff.

In support of their assertion that Prince was a known drug dealer and often conducted illegal activity from the Escalade, Defendants cite deposition testimony of defendant Alfred Martin ("Martin") that he knew Prince to be a

5

member of a certain gang on the south end of Albany and that for a period of about three years they had a "working relationship" and knew each other by face. Dep. of Alfred Martin, Apr. 9, 2009, 10:17-11:2, at Ex. BB to Rehfuss Aff. Martin also testified that he had "been a party to [Prince] being arrested for drugs." Id., at 10:20-22.  To be sure, Defendants submitted a copy of a January 4, 2004 incident report, which reflects that Prince was charged with criminal possession of a controlled substance and criminal possession of a narcotic with intent to sell after a traffic stop during which Prince was driving a 2000 Cadillac Escalade.  See Ex. D to Rehfuss Aff.[5]  According to the report, crack cocaine was found in the driver's side door.  See id.  Thus, the only evidence in this record that Prince ever conducted illegal activity from the Escalade is his January 2004 arrest.

After several months of surveillance by the OAG, APD and the State Police, Dormin obtained sealed indictments and arrest warrants for approximately fifteen individuals, including Prince Hines, in connection with drug activity within the City of Albany.  At approximately 6:25 a.m. on April 29, 2006 certain

---

[5] The incident report was submitted to the court as an exhibit to the affidavit of Defendants' counsel.  Because the purpose of an attorney affidavit is to provide background and is not made on personal knowledge, the affidavit is not considered part of the record for purposes of a motion for summary judgment.  See N.D.N.Y. R. 7.1(a)(3); Fed. R. Civ. P. 56(c)(4).  See also Randell v. United States, 64 F.3d 101, 109 (2d Cir.1995).  However, on a motion for summary judgment, a party is not required to authenticate documents, where, as here, authenticity is not challenged by the other party.  See United States. v. Painting known as Hannibal, No. 08-Civ.-1511, 2010 WL 2102484, at *1, n.2 (S.D.N.Y. May 18, 2010) (citing Daniel v. UnumProvident Corp., 261 F.App'x 316, 319 (2d Cir. 2008)).  Moreover, there is no need to comply with the formal requirement that evidence be authenticated where it is clear that documents submitted by a non-moving party could be produced in admissible form at trial.  See Rosenthal v. Nierenberg, No. 09-Civ.-8237, 2010 WL 3290994, at *2, n.2 (S.D.N.Y. Aug. 10, 2010) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S.Ct. 2548 (1986) (nonmoving party need not "produce evidence in a form that would be admissible at trial in order to avoid summary judgment")).

members of APD executed the arrest warrant for Prince Hines at 38 Osborne Street.  During the course of his arrest, Prince admitted to possessing marijuana in his bedroom.  Based on this admission, defendant John Monte ("Monte") applied for and received a warrant to search 38 Osborne St.  See Ex. H to Rehfuss Aff.

Prior to the date of Prince's arrest, a meeting was held between APD, OAG and the State Police to discuss the execution of the arrest warrants.  At that time, a discussion took place regarding a list of vehicles that were targeted for possible forfeiture, including the Escalade.  See Dormin Dep., 58:8-59:9.  According to Dormin, he was asked at this meeting if he believed there was sufficient evidence to take possession of the Escalade and Dormin responded that he "believed there was."  Id., 44:1-20.  Dormin also testified that during the meeting, APD expressed an interest in forfeiting the Escalade.  See id., 75:21-76:3.

On April 29, 2006, in the course of executing the arrest warrant for Prince, APD seized the Escalade.  Plaintiffs submit that the Escalade was seized without a warrant, citing only an attorney affidavit for support.  Defendants object on the basis that the statement is not supported by admissible evidence.  To be sure, attorney affidavits are not part of the record for purposes of a motion for summary judgment.  See N.D.N.Y. R. 7.1(a)(3); Fed. R. Civ. P. 56(c)(4).  See also Randell v. United States, 64 F.3d 101, 109 (2d Cir.1995).  Here, counsel for Plaintiffs submits by affidavit that his examination of the record reflects that APD never obtained a warrant to search or seize the Escalade.  See Steck Aff. ¶ 8.  Without waiving their objection, Defendants deny this statement, arguing that Dormin "unequivocally testified that the APD had authority to search and seize the vehicle pursuant to the arrest warrant he obtained, as well as the search warrant later obtained by the APD."  Defs.' Resp. to Pls.' SOMF at ¶ 4, Dkt. No. 80-2, citing Dormin Dep., 44-45.  In fact, there is nothing unequivocal about Dormin's

7

testimony in this regard.  For example, the portion of his testimony cited by
Defendants merely represents that about a week before Prince's arrest, Dormin
stated that there was sufficient evidence to take possession of the Escalade, and it
was agreed that the police would seize the Escalade in the course of Prince's
arrest.  Dormin also testified that APD did not apply for a warrant to seize the
Escalade, see Dormin Dep., 43:18-23, but earlier testified that the warrant to
search 38 Osborne Street references a vehicle and "does specify the Cadillac
Escalade[,]" 8:19-9:6.  When asked to identify the location of the warrant that
specifies the Escalade, Dormin cited the section directing a search of 38 Osborne
Street, including "other areas that [] Prince [] has dominion and control over, to
include but not limited to a yard, stor[]age area, shed, attic, basement or safe" as
well as the section describing property to be seized as items "that prove
ownership or control of the above described location, vehicle or item and/or
Possession, Sale or Conspiracy to Possess, Sell and Distribute [Marihuana]."  See
id., 8:19-9:20; Ex. H to Rehfuss Aff.  Clearly the above-cited language does not
mention the Escalade specifically.  Moreover, the reference to "vehicle" relates to
any "above described" vehicle, of which there is none.  At best, "other areas that
[] Prince [] has dominion and control over" could be interpreted to include the
Escalade.  Nonetheless, the application for the search warrant was made *after* the
Escalade was seized, and the arrest warrant makes no mention of the Escalade or
any vehicle whatsoever.

    On April 29, 2006, Roberts transported the vehicle from 38 Osborne Street
to the APD traffic safety vehicle lot.  See Dep. of Brian D. Quinn, Mar. 16, 2009,
33:17-34:16; 44:11-17, Ex. W to Rehfuss Aff.  Roberts completed a "Property
Report" regarding the Escalade when it was taken into custody.  See Roberts
Dep., 16:23-17-9.  See also Ex. J to Rehfuss Aff.  According to Roberts, the

vehicle was seized per the direction of OAG.  <u>See</u> Roberts Dep., 18:17-22.
Roberts also testified that he authorized the seizure of the vehicle, and that he was
responsible for the vehicle from the time it was seized until it was transferred to
the traffic safety lot.  <u>See</u> id., 20:1-19.  The vehicle was held there for forfeiture
proceedings at the direction of Defendant Quinn.  <u>See</u> Ex. I to Rehfuss Aff.

According to Dormin, once a criminal case concluded, it was up to the
police agency with custody of the vehicle to decide whether or not it should be
forfeited.  <u>See</u> Dormin Dep. 67:6-23.  In this case, according to Dormin, that
agency was APD.  <u>See</u> id., 10-63:2.  According to Quinn, Dormin requested that
the Escalade be seized for possible forfeiture, and it was up to Quinn's discretion
whether to comply with that request.  <u>See</u> Quinn Dep., 32:21-34:4; Dep. of James
W. Tuffey, June 23, 2009, 17:7-18:20, Ex. U to Rehfuss Aff.  Dormin testified
that prior to the arrest of Prince Hines, it was determined that the vehicle was to
be seized as evidence for his criminal prosecution, and that during the course of
the criminal prosecution by OAG, it was decided that the vehicle would be held
as evidence.  <u>See</u> Dormin Dep., 81:8-82:3.  Dormin also testified that there were
no photographs taken of the vehicle, nor was it his intent to bring the vehicle into
the courtroom during a criminal trial.  <u>See</u> id., 52:14-53:1.

On April 29, 2006, APD found no contraband in the Escalade, nor did it
find contraband during an inventory search of the Escalade, conducted that same
day or soon thereafter.

After the events of April 29, 2006, Constance Hines repeatedly contacted
OAG, APD, and even the criminal court, seeking the return of her vehicle.  On
May 23, 2006, Constance Hines's then counsel wrote to Dormin seeking return of
the Escalade.  Dormin replied that "[w]e will not agree to release the car at this
time."  Ex. M to Rehfuss Aff.  Dormin explained that the vehicle "is evidence in

an ongoing investigation and a pending criminal charge" and "evidence exists that would support a forfeiture of the car at the conclusion of the criminal case." Id.  Dormin testified that he never took any steps to forfeit the vehicle.  See Dormin Dep., 2-8.  On August 2, 2006, and again on August 15, 2006, Constance Hines's current counsel wrote to Dormin seeking return of the Escalade.  On September 6, 2006, Tuffey[6] replied that the "vehicle is in the possession of [APD].  [APD] and [OAG] seized the vehicle pursuant to a narcotics investigation that is being conducted.  The vehicle will be held by these agencies until said investigation is complete.  At such time, [you] will be notified of the disposition of the vehicle."  Ex. P to Rehfuss Aff.

Constance Hines also made repeated telephone calls to APD between April 29 and September 6, 2006 regarding the Escalade.  See Dep. of Michael Haggerty, Apr. 8, 2009, 18:15-19; 20:19-20:2; 24:13-26, at Ex. EE to Rehfuss Aff.  Those calls were dealt with by M. Haggerty, whose responsibility it is to develop and implement the procedures regarding seized assets for APD.  See id., 8:19-22.  His role is to initiate forfeiture proceedings once the assets have been seized.  See id., 12:15-17.  According to M. Haggerty, in this case, someone from OAG alerted him prior to April 29, 2006, that the Escalade, among other vehicles, would be seized, so that he could initiate the proper paperwork.  See id., 9:9-10:13.  Once the Escalade was seized, M. Haggerty went to the traffic safety lot and inspected the outside of the vehicle to make sure that it was secure.  See id., 13:18-14:8.  According to M. Haggerty, APD was holding the vehicle for OAG, who was actually prosecuting the case, "[s]o anything that was going to be done with [the vehicle,] would be done by them."  Id., 14:9-14.  Normally, under New

---

[6] Michael Haggerty testified that he drafted this letter for Chief Tuffey's signature.  See M. Haggerty Dep., 29:20-30:10.

York State law, according to M. Haggerty, the forfeiture procedure would be commenced by his issuing a letter of abandonment to the owner of the vehicle. No such letter was issued in this case.  See id., 15:13-17-23.  About a week after seizure of the Escalade, Dormin notified M. Haggerty by telephone that OAG intended to hold the vehicle, and that it should not be released until Dormin gave him authority to do so.  See id., 18:2-16.  Sometime thereafter, M. Haggerty made Tuffey aware of the substance of his conversation with Dormin.  See id., 19:3-9. Thus, when M. Haggerty received a call from Constance Hines, he would call Dormin, who would indicate that the vehicle should be held until the criminal case is resolved.  See id., 19:15-20:12; 21:19-22:3.

On June 27, 2007, Constance Hines wrote to Albany County Court Judge Stephen W. Herrick seeking information on the status of her vehicle.  See Ex. H to Steck Aff.  Constance Hines wrote that pursuant to a conversation she had that day with M. Haggerty, the vehicle is being held for OAG at an APD garage despite attorney Lee having said, at the final court appearance, that "he had no interest in [her] truck."  Id.  M. Haggerty testified that at some point in 2007, he received a call from a lawyer for OAG authorizing him to release the Escalade. Robert J. Lee, assistant deputy attorney general with OAG, notified M. Haggerty in writing on July 10, 2007, that the Escalade "is not needed as evidence in any criminal proceedings" and OAG "will not seek forfeiture of this vehicle."  Ex. Q to Rehfuss Aff.  Accordingly, Lee wrote, "this vehicle can be released to the registered owner."  Id.  M. Haggerty thereafter authorized the vehicle to be released from the traffic safety division and informed Constance Hines by telephone that she could come and pick up her vehicle.  That same day, Constance Hines picked up the vehicle.  See id., 25:16-28:11.

### B.  Seizure of Constance and Marshay Hines

At approximately 6:25 a.m. on April 29, 2006 one team of officers from APD's Emergency Services Team ("EST") was stationed at the front door and another at the back door of 38 Osborne Street.  These officers, including Monte, Martin, and Brian Plante ("Plante"), then entered the residence in order to effectuate the arrest warrant for Prince Hines.

During the time that officers searched for Prince Hines, arrested him and removed him from the house, it is undisputed that Constance and Marshay Hines were secured and held with handcuffs.  It is also undisputed that during this time, Plaintiffs were secured for their safety.  See Defs.' SOMF ¶43; Pls.' Resp. to Defs.' SOMF ¶ 43.[7]  Moreover, it is undisputed that the defendant officers who were effectuating the arrest of Prince Hines were inside 38 Osborne Street for ten to fifteen minutes. What is disputed, however, is whether, and for how long thereafter, Plaintiffs' detention continued.[8]

At approximately 6:30 a.m., officers Tim Haggerty ("T. Haggerty") and Robert Mulligan ("Mulligan") arrived at 38 Osborne Street.  Upon their arrival, members of the EST were still at the scene, finalizing effectuation of the arrest warrant.  As one of the EST members was leaving the scene, he instructed T. Haggerty and Mulligan that they were to secure the premises pending application

---

[7] See also Dep. of John Monte, Mar. 16, 2009, 231-13, at Ex. CC to Rehfuss Aff. ("anybody 14 or over is initially secured until we search the entire location, for the safety of the occupants as well as the executing officers.")

[8] The parties make much of the factual dispute regarding whether Plaintiffs were secured with plastic, "flex-cuffs" or metal handcuffs.  The court is unaware of any case, nor do the parties cite any case, where a court dealt with the claim that a seizure was unreasonable due in whole or in part to the use of one type of restraint or the other, absent some evidence, notably lacking here, that the restraints used were somehow too restrictive or that one type of restraint was preferred over the other for some health related reason.  Accordingly, this dispute is immaterial to Plaintiffs' unreasonable seizure claim.

for, and receipt of, the search warrant by Monte.[9]  Mulligan understood that this meant that they were not to "let people contaminate any kind of future crime scene or steal any evidence that they're trying to procure from the building." Mulligan Dep., 6:8-14.  See also T. Haggerty Dep., 6:1-5 ("Secure the premises" means "to not allow disruptment (sic) or movement o[f] anything inside the premise[s].")  Monte testified that the officers were instructed to stay with Plaintiffs until the Community Response Team returned with the search warrant. See Dep. of John Monte, Mar. 16, 2009, 20:15-21, at Ex. CC to Rehfuss Aff. However, Monte also testified that he told the officers that Plaintiffs were free to go, but that the premises needed to be maintained until the search warrant was executed.  See id., 28:5-12.

At approximately 8:00 a.m., officers Jeffrey Hyde ("Hyde") and Robert Shunck ("Shunck") replaced Mulligan and T. Haggerty, as their regularly scheduled shifts had ended.  Hyde and Shunck remained at 38 Osborne Street with Plaintiffs until the search warrant was obtained and executed.

According to T. Haggerty, neither of the Plaintiffs left or requested permission to leave the premises during the time he was at 38 Osborne Street. See T. Haggerty Dep., 11:3-21.  Constance Hines testified that she asked T. Haggerty if she could leave the house and he told her she could not.  See C. Hines Dep., 66:17-67:10.  According to Constance, she was not allowed to leave after Hyde and Shunck arrived either.  See id., 75:7-17.

During the entire time that Mulligan and T. Haggerty were at 38 Osborne Street, Plaintiffs remained inside with the officers.  Shortly after the arrival of

_____

[9] T. Haggerty testified that this EST member was either Monte or Martin, while Mulligan testified that it was Martin.  See Dep. of Timothy Haggerty, Apr. 9, 2009, 5:21-24, at Ex. Y to Rehfuss Aff.; Dep. of Robert Mulligan, Apr. 8, 2009, 5:19-6:2, at Ex. DD to Rehfuss Aff.

Hyde and Shunck, however, Plaintiffs and the officers went outside.

According to Monte, Plaintiffs were not handcuffed when he left 38 Osborne Street after Prince Hines was arrested.  See Monte Dep., 28:16-20. Plante testified that, although he secured Marshay Hines in her room, he did not handcuff her, and was not the officer who brought her downstairs to the living room.  See Dep. of Brian C. Plante, Mar. 17, 2009, 7:4-10:16, at Ex. AA to Rehfuss Aff.  Further, according to Plante, at the time he was leaving the house, he saw Marshay downstairs and she was not handcuffed.  See id., 11:20-11. Mulligan testified that when he arrived at 38 Osborne Street, Plaintiffs were sitting on the coach and were not in handcuffs.  See Dep. of Robert Mulligan, Apr. 8, 2009, 7:23-8:6, at Ex. DD to Rehfuss Aff.

Constance Hines testified that she remained in handcuffs when officers took her from her bedroom into the kitchen, and then into the living room. Constance also testified that when Marshay was brought downstairs into the living room, she was in handcuffs as well.  According to Constance, at some point while she was in the living room, after Marshay came downstairs, her handcuffs were removed so that she could retrieve the keys to the Escalade.  See C. Hines Dep., 56:17-58:22.  Marshay Hines testified that when she came downstairs, she was in handcuffs and that her handcuffs were not removed until the officers let Constance and her sit outside on the front porch.  See Dep. of Marshay Hines, Mar. 26, 2009, 29:8-24, at Ex. C to Steck Aff. and Ex. GG to Rehfuss Aff. Marshay also testified that when the officers removed Constance's handcuffs so that she could retrieve the keys to the Escalade, they put them right back on again after the officers took the keys.  See id., 30:7-17.  According to Marshay, both her mother and she remained handcuffed until the officers returned to 38 Osborne Street with the search warrant.  See M. Hines Dep., 30:18-21; 39:22-40:2.

Marshay also testified that she remained handcuffed when they were outside on the front porch, with the exception of the time it took for Marshay to use the bathroom, until the point at which the officers returned to execute the search warrant.  See id., 34:2-22.

Hyde testified that during the time they were on the porch, Constance Hines indicated that she was going to be late for work and had to call her place of employment, which she proceeded to do.  See Hyde Dep., 8:2-9.  Hyde further testified that "as the day went on" Constance was walking up and down the street, talking on her cell phone, but Marshay "pretty much just sat on the front porch." See id., 9:22-10:8.  Quinn testified that when he arrived at 38 Osborne Street around 12:30, Constance was "moving around" and he saw her across the street with a neighbor.  See Quinn Dep., 35:22-36:6.

Monte testified, without being able to give an exact time, that he returned to 38 Osborne Street to effectuate the search warrant "a few hours" after he left to commence the application for the warrant.  See Monte Dep., 29:21-30:1. According to Quinn, the search warrant was still being executed, if not completed, when he arrived at 38 Osborne Street around 12:30 p.m.  See Quinn Dep., 35:3-16.  Hyde testified that Shunck and he were with Plaintiffs for four or five hours, until 12:30 or 1:00 p.m.  See Dep. of Jeffrey Hyde, June 15, 2009, 8:15-16, 10:9-13, at Ex, V to Rehfuss Aff.  Marshay Hines testified that probably two to three hours elapsed between the time the officers left to get the search warrant and the time they returned to conduct the search.  See M. Hines Dep., 39:2-21.  According to Hyde, the search took no more than twenty minutes.  See Hyde Dep., 11:3-4.

## IV.  Discussion

### A.  Legal Standard

A motion for summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The movant has the initial burden to show the court why it is entitled to summary judgment.  See Salahuddin v. Goord, 467 F.3d 263, 272 (2d Cir. 2006) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548 (1986)).  If the movant meets its burden, the burden shifts to the non-movant to identify evidence in the record that creates a genuine issue of material fact.  See id., at 273 (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348 (1986)).

When deciding whether a material issue of fact is in dispute, the court is cognizant that "[a] fact is material when it might affect the outcome of the suit under governing law." Tracy v. Freshwater, 623 F.3d 90, 95 (2d Cir. 2010) (internal citation omitted).  Also, a material fact is genuinely in dispute "if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Bessemer Trust Co., N.A. v. Branin, 618 F.3d 76, 85 (2d Cir. 2010) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510 (1986)).

"In ruling on a motion for summary judgment, the district court may rely on any material that would be admissible or usable at trial." Major League Baseball Props., Inc. v. Salvino, Inc., 542 F.3d 290, 309 (2d Cir. 2008) (internal quotation and citation omitted).  Finally, when the court is deciding a motion for summary judgment, it must resolve all ambiguities and draw all reasonable inferences in the non-movant's favor.  See Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004) (citing Adickes v. S. H. Kress & Co., 398 U.S.

16

144, 157, 90 S.Ct. 1598 (1970)).

It should also be noted that, pursuant to Local Rule 7.1(a)(3), the court deems admitted any properly supported statement of material fact that is not specifically controverted by the opposing party.  See N.D.N.Y. R. 7.1(a)(3).  See also Figueroa v. Tri-City Highway Prods., Inc., No. 08-CV-868, 2010 WL 3635247, at *2 (N.D.N.Y. Sept. 10, 2010) (citations omitted).

### B.  42 U.S.C. § 1983

In order to establish a claim pursuant to 42 U.S.C. § 1983, a plaintiff must show "(1) that some person has deprived him of a federal right, and (2) that the person who has deprived him of that right acted under color of state ... law." Velez v. Levy, 401 F.3d 75, 84 (2d Cir. 2005) (quoting Gomez v. Toledo, 446 U.S. 635, 640, 100 S.Ct. 1920 (1980) (internal quotations omitted)).  "Section 1983 is not itself a source of substantive rights[,] but merely provides a method for vindicating federal rights elsewhere conferred[.]" Patterson v. County of Oneida, 375 F.3d 206, 225 (2d Cir. 2004) (quoting Baker v. McCollan, 443 U.S. 137, 144 n.3, 99 S.Ct. 2689 (1979)).

In order to establish a § 1983 claim against a government official in his individual capacity, a plaintiff need only "show that the official, acting under color of state law, caused the deprivation of a federal right." Hafer v. Melo, 502 U.S. 21, 25, 112 S.Ct. 358, 362 (1991) (quoting Kentucky v. Graham, 473 U.S. 159, 166, 105 S.Ct. 3099, 3105 (1985)).  The government official, for his part, may assert the personal immunity defense of qualified immunity.  See id.

A prerequisite to an award of damages on a § 1983 claim against an individual is personal involvement in the alleged constitutional deprivation.  See Farrell v. Burke, 449 F.3d 470, 484 (2d Cir. 2006) (citing Wright v. Smith, 21 F.3d 496, 501 (2d Cir.1994) (abrogated on other grounds, Sandin v. Conner, 515

17

U.S. 472, 115 S.Ct. 2293 (1995))).  A plaintiff may establish the personal involvement of a defendant-supervisor by showing that he "(1) directly participated in the violation, (2) failed to remedy the violation after being informed of it by report or appeal, (3) created a policy or custom under which the violation occurred, (4) was grossly negligent in supervising subordinates who committed the violation, or (5) was deliberately indifferent to the rights of others by failing to act on information that constitutional rights were being violated." Iqbal v. Hasty, 490 F.3d 143, 152-53 (2d Cir. 2007) (citing Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir.1995)) (rev'd on other grounds, Ashcroft v. Iqbal, — U.S. —, 129 S.Ct. 1937 (2009)).

### *1.  Unreasonable Seizure Claim*

In their Second Amended Complaint, Plaintiffs allege that all defendants except M. Haggerty violated their Fourth and Fourteenth Amendment rights when Plaintiffs were held for approximately eight hours pending the application for a search warrant.  See ¶ 74.  Defendants seek summary judgment on this claim, arguing that caselaw supports the conclusion that the detention of Plaintiffs did not amount to an impermissible seizure under the Fourth Amendment.  Plaintiffs counter that, drawing all inferences and resolving all ambiguities in their favor, the evidence shows that their detention was unreasonable, given that they were held in handcuffs for eight hours pending the application for, and receipt of, a search warrant.

In Michigan v. Summers, 452 U.S. 692, 101 S.Ct. 2587 (1981), the Supreme Court held that "for Fourth Amendment purposes, [] a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted."  Id., at 705, 101 S.Ct. at 2595.  Courts have applied the holding in

<u>Michigan v. Summers</u> to cases where, as here, the detention occurred pursuant to the enforcement of a valid arrest warrant.  <u>See</u> <u>Bartlett v. City of New York</u>, No. CV031961CPS, 2005 WL 887112, at *8 (E.D.N.Y. Feb. 11, 2005) (<u>citing</u> <u>United States v. Pichardo</u>, No. 92-CR-354, 1992 WL 249964, at *5 (S.D.N.Y. Sept. 22, 1992); <u>Anderson v. United States</u>, 107 F.Supp.2d 191, 197 (E.D.N.Y. 2000) (<u>aff'd</u>, 41 F.App'x 506 (2d Cir. 2002)).  Courts have also held that the use of force, including handcuffs, does not render such a detention unconstitutional.  In <u>Anderson</u>, for example, the court found that an approximately one hour detention of a residence's adult occupants,  including the use of handcuffs, while the police were executing an arrest warrant and securing the premises, was reasonable under the Fourth Amendment.  <u>See</u> <u>id.</u>, at 197.  <u>See also</u> <u>Muehler v. Mena</u>, 544 U.S. 93, 102, 125 S.Ct. 1465, 1472 (2005) (holding that, consistent with <u>Summers</u>, the detention of an occupant of a residence by use of handcuffs for a period of two to three hours during the execution of a search warrant did not violate the occupant's Fourth Amendment rights).

Here, it is undisputed that Plaintiffs were detained, with the use of handcuffs, during the time it took for the officers, including defendants Monte, Plante, and Martin, to locate and arrest Prince Hines and remove him from the premises pursuant to a valid arrest warrant.  There is no question, therefore, that the detention during this period of time was reasonable under the Fourth Amendment.  There is also no question that it was not a violation of the Fourth Amendment for officers to remain at 38 Osborne Street while the application for a search warrant was pending, as "[s]uch action was necessary to secure the [premises] and prevent the destruction of evidence while other officers sought a search warrant in good faith."  <u>U.S. v. U.S. Currency in Amount of Five Hundred Ninety-Eight Thousand Eight Hundred Twenty Six Dollars</u>, No. 00-CV-7073,

2007 WL 2713367, at *12 (E.D.N.Y. Sept. 13, 2007) (citing Segura v. United States, 468 U.S. 796, 798, 104 S.Ct. 3380 (1984)).

However, Plaintiffs have adduced evidence that they were held, most of the time in handcuffs, an additional six hours while officers applied for, received and effectuated a search warrant.  In Muehler, the Court repeated its earlier explanation in Summers that detention of the occupants of premises being searched for contraband pursuant to a valid warrant are appropriate "because the character of additional intrusion caused by detention is slight and because the justifications for detention are substantial." Muehler, 544 U.S. at 98, 125 S.Ct. at 1469 (citing Summers, 452 U.S. at 701-705, 101 S.Ct. 2587).  The Court went on to explain that in Summers, it

> posited three legitimate law enforcement interests that provide substantial justification for detaining an occupant: preventing flight in the event that incriminating evidence is found; minimizing the risk of harm to the officers; and facilitating the orderly completion of the search, as detainees' self-interest may induce them to open locked doors or locked containers to avoid the use of force.

Id., at 98, 125 S.Ct. at 1469-70 (citing Summers, 452 U.S. at 702-703, 101 S.Ct. 2587).  The Court then noted that the government interest in minimizing the risk of harm to the officers by a detention and the use of handcuffs is at its maximum where, as was the case in Muehler, "a warrant authorizes a search for weapons and a wanted gang member resides on the premises." Id., at 100, 125 S.Ct. at 1470-71.  Although the execution of a search warrant for weapons was enough to justify the use of handcuffs, the Court found, the need to detain multiple occupants made the use of handcuffs all the more reasonable.  Id., at 100, 125 S.Ct. at 1471.  The Court concluded the detention was not unreasonable, despite

its length and the use of handcuffs, because those factors were outweighed by the government's continuing safety interests, noting that the case involved "the detention of four detainees by two officers during a search of a gang house for dangerous weapons." Id.  The Court also went on to note that while "a lawful seizure can become unlawful if it is prolonged beyond the time reasonably required to complete that mission," the interrogation of one of the occupants regarding her immigration status did not prolong her detention, and therefore it was not unreasonable. Id., at 101, 125 S.Ct. 1471 (quoting Illinois v. Caballes, 543 U.S. 405, 407, 125 S.Ct. 834, 836-838 (2005).

Here, there are questions of fact as to whether Plaintiffs continued to be detained after Prince was removed from the house, for how long, and whether handcuffs were used.  Plaintiffs have submitted evidence that they were detained, most of the time in handcuffs, until approximately 1:00 p.m. when the officers concluded the search of their home.  Defendants argue that even assuming the facts are as Plaintiffs assert, such a detention is not unreasonable under the Fourth Amendment.  Defendants rely almost exclusively on Diaz v. City of New York, No. 00-CV-2944, 2006 WL 3833164 (E.D.N.Y. Dec. 29, 2006), which involved an over five-hour detention of the occupants of a residence while officers executed a search warrant for the premises.  Relying on Summers and Muehler, the court there found the detention reasonable, noting that "the search was not unnecessarily long or intrusive." Id., at *6.  It is questionable, however, in light of Muehler, whether under the factual circumstances adduced by Plaintiffs here, their detention was reasonable.  While Muehler, "involved the detention of four detainees by two officers during a search of a gang house for dangerous weapons[,]" see 544 U.S. at 100, 125 S.Ct. at 1471, here, as well as in Diaz, the search warrant authorized a search for drugs, not weapons.  Accordingly, factors

that the court considered in <u>Muehler</u>, such as the possible presence of a gang member and/or weapons at the residence, are absent here.[10]  However, other interests that could be considered in deciding whether the detention here was reasonable include "facilitating the orderly completion of the search, as detainees' self-interest may induce them to open locked doors or locked containers to avoid the use of force."  <u>Id.</u>, at 98, 125 S.Ct. at 1469-70 (<u>citing</u> <u>Summers</u>, 452 U.S. at 702-703, 101 S.Ct. 2587).  In this case, however, as opposed to <u>Muehler</u> and <u>Diaz</u>, Plaintiffs were being detained pending the *application for*, as well as the execution of, a search warrant.  Accordingly, other factors such as the length of Plaintiffs' detention and whether and for how long handcuffs were used, would be relevant in determining whether the detention was reasonable.  As there are questions of fact regarding those relevant issues, Defendants' motion for summary judgment as to this claim must be denied, at least insofar as defendants T. Haggerty, Mulligan, Hyde and Shunck are concerned, as they are the only officers who were personally involved in the detention at issue here.

     To the extent Plaintiffs also assert the liability of Monte, Martin, and Plante on this claim based on their failure to direct defendants Mulligan and T. Haggerty that Constance and/or Marshay Hines should be released, summary judgment is appropriate.  There is no evidence, nor do Plaintiffs assert, that any of these three defendants were in a position to supervise T. Haggerty, Mulligan, Hyde and/or Shunck, who were the officers alleged to have detained Plaintiffs during the time at issue.

     Also, to the extent Plaintiffs assert this claim against defendants Tuffey, Roberts and Quinn, summary judgment is also appropriate.  There is an absence

---

[10] Although Martin testified regarding Prince Hines's gang membership, it is clear that Prince was no longer on the premises during the time at issue here.

of record evidence of their involvement with Plaintiffs' detention at issue in this claim.

Finally, as to Plaintiffs' assertion that the City is liable on this claim pursuant to Monell v. Dep't of Soc. Serv. of the City of New York, 436 U.S. 658, 694-95, 98 S.Ct. 2018, 2037-38 (1978), summary judgment will be entered against them.  A municipal entity, such as the City here, may not liable pursuant to § 1983 under the theory of respondeat superior, but may be liable where its employee acted pursuant to an official policy, custom, or practice of said entity. See Monell, 436 U.S. at 694-95, 98 S.Ct. at 2037-38; Rojas v. Alexander's Dep't Store, Inc., 924 F.2d 406, 408 (2d Cir. 1990).  Such a policy, custom or practice may "be inferred where the municipality so failed to train its employees as to display a deliberate indifference to the constitutional rights of those within its jurisdiction."  Patterson, 375 F.3d at 226 (quoting Kern v. City of Rochester, 93 F.3d 38, 44 (2d Cir. 1996)) (internal quotation marks omitted).

Here, Plaintiffs allege that the City is liable because "testimony established that neither T. Haggerty nor Mulligan had received formal training in how to secure a scene while waiting for a search warrant" and APD "has no explicit written policy concerning the appropriate steps to take in securing a scene while waiting for a search warrant" but instead has a policy to "leave decisions concerning how to secure the scene up to the individual officers (who are not trained)."  Pls.' Mem. of Law at 14-15, Dkt. No. 77-2.  Plaintiffs conclude that the failure to train officers coupled with giving those officers unbridled discretion to secure a scene  as they see fit while waiting for a search warrant permits the inference that the City "so failed to train its employees as to display a deliberate indifference to the constitutional rights of those within its jurisdiction."  Id. (citing Hines, 542 F.Supp.2d at 228.)

In support of their argument, Plaintiffs cite Mulligan's testimony that he did not receive any training, nor was he aware of any published policy of the City regarding how to secure a scene while waiting for a search warrant.  <u>See</u> Mulligan Dep., at 11:21-12:6.  Plaintiffs also cite T. Haggerty's testimony that he did not receive any "formal" training.  <u>See</u> T. Haggerty Dep., 13:4-9.  However, he also explained that he received "field" training that securing the premises while an application for a search warrant was pending entailed the limiting of traffic inside and outside of the residence and the  prevention of the "disruptment (sic) or movement of anything inside the premise[s]."  Id., 6:4-5; 13:9-15.  In addition, in support of their contention that APD has no explicit written policy regarding how to secure a scene while waiting for a search warrant, but that such decisions are left up to the untrained officers, Plaintiffs cite Tuffey's testimony in response to the question of whether there is a policy for how to deal with the occupants of a home in that situation.  <u>See</u> Tuffey Dep., 26:10-12.  According to Tuffey, the officers "would secure all individuals until such time as we sorted everything out[.]" Id., 26:14-16.  Tuffey went on to explain that several factors come into play such as whether the search warrant will be sought orally or in writing and whether the individuals in the house have access to weapons.  <u>See</u> id., 26:16-27:2.  Tuffey also expressed that there is an interest in the officers' safety in such a situation, as well as that of the occupants.  <u>See</u> id., 27:3-5, 22-28:2.  Tuffey concluded that, after considering those factors, if the occupants "could be appropriately released at that point, . . . then you'd let them go, but otherwise, you'd keep them until it was all completed."  Id., 27:6-10.  Accordingly, Tuffey testified, it is up to the discretion of the individual officers, based on what they "face when they go into that house," whether to release the occupants. Id., 27:11-22.  Tuffey further explained that "[s]tandard operating procedure is a guideline.

24

Officers need to be able to adapt to the situation at hand." Id., 28:5-11.

The Supreme Court has held "that there are limited circumstances in which an allegation of failure to train can be the basis for liability under § 1983." City of Canton v. Harris, 489 U.S. 378, 387, 109 S.Ct. 1197, 1204 (1989). Further, the Court has held that "the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." Id., at 388, 109 S.Ct. at 1204. In such a case, a municipality will only be liable "where a failure to train reflects a deliberate or conscious choice by a municipality." Id., at 389, 109 S.Ct. at 1205.

The Supreme Court instructed that lower courts, when resolving the issue of a municipality's liability, must

> focus . . . on the adequacy of the training program in relation to the tasks the particular officers must perform. That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program. It may be, for example, that an otherwise sound program has occasionally been negligently administered. Neither will it suffice to prove that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct. Such a claim could be made about almost any encounter resulting in injury, yet not condemn the adequacy of the program to enable officers to respond properly to the usual and recurring situations with which they must deal. And plainly, adequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the city liable.

Id., at 390-391, 109 S.Ct. at 1206 (internal citations omitted).

The Court later explained that a pattern of violations is usually necessary to demonstrate deliberate indifference for purposes of failure to train.  See Connick v. Thompson, — U.S. —, 131 S.Ct. 1350, 1360 (2011) (citing Board of Comm'rs of Bryan Cty. v. Brown, 520 U.S. 397, 409, 117 S.Ct. 1382, 1389 (1997).  However, the Court also noted that in Canton, it "did not foreclose the possibility that evidence of a single violation of federal rights, accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation, could trigger municipal liability." Bryan Cty., at 409, 117 S.Ct. at 1391 (citing Canton, 489 U.S., at 390, and n.10, 109 S.Ct., at 1205, and n.10).

Here, Plaintiffs have failed to show a pattern of violations, relying instead on the single incident at issue in this case.  Moreover, Plaintiffs have also failed to show that the City failed to train its officers.  Tuffey testified regarding the City's "standard operating procedure" and the ability of the officers to make decisions based on the situation at hand.  T. Haggerty testified that he received field training[11] about how to secure a scene while an application for a search warrant was pending.  In addition to the insufficiencies in Plaintiffs' proof regarding a lack of training, the court is mindful of the Supreme Court's instruction: "That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city." Canton, 489 U.S. at 390, 109 S.Ct. at 1206.  Accordingly, as to Plaintiffs' Monell claim against the City for failure to train its officers regarding the procedures for securing occupants of a home pending the application for a search warrant, Defendants' motion for summary

---

[11] While Plaintiffs' infer that a formal, written policy is required, the Court has recently clarified that "failure-to-train liability is concerned with the substance of the training, not the particular instructional format."  Connick v. Thompson, — U.S. —, 131 S.Ct. 1350, 1363 (2011).

judgment is granted.

### 2. *Unreasonable Seizure and Due Process Claim*

Next, plaintiff Constance Hines alleges that all defendants violated her Fourth, Fifth and Fourteenth Amendment rights when they seized her vehicle without probable cause and without a warrant, and when they subsequently failed to provide her with a hearing or any kind of process to determine whether the vehicle should be returned to her or retained by the City.  Defendants and Plaintiffs seek summary judgment on this claim.

To be sure, "[t]he Due Process Clause of the Fifth Amendment prohibits the United States, as the Due Process Clause of the Fourteenth Amendment prohibits the States, from depriving any person of property without 'due process of law.'" Tupaz v. Clinton County, New York, 499 F.Supp.2d 182, 189, n.1 (N.D.N.Y. 2007) (quoting Dusenbery v. United States, 534 U.S. 161, 167, 122 S.Ct. 694, (2002)).  Plaintiffs have failed to allege a claim against the United States.  Accordingly, any claim for a purported violation of their rights under the Fifth Amendment's Due Process Clause must be dismissed with prejudice.

Seizures of personal property without a warrant are per se unreasonable unless law enforcement has probable cause to believe the property holds contraband or evidence of a crime.  See United States v. Howe, No. 09-CR-6076L, 2011 WL 2160472, at *8 (W.D.N.Y. May 27,2011) (citing United States v. Place, 462 U.S. 696, 701, 103 S.Ct. 2637 (1983).  Here, it is undisputed that Defendants did not have a warrant to seize the Escalade.  In their memorandum of law, however, Defendants assert that "Dormin . . . unequivocally informed . . . [Roberts and Quinn] that there was sufficient basis *and a warrant* to seize the Escalade on behalf of the OAG."  Defs.' Mem. of Law at 10, Dkt. No. 71 (citing

Quinn  Dep., 33; Dormin Dep., 45) (emphasis added).[12]  The cited deposition testimony from Quinn reflects that Dormin directed that the Escalade should be taken and secured but that no warrant had been provided.  The cited deposition testimony from Dormin reflects that it was agreed between Quinn and OAG that the Escalade should be seized at the time of the arrest, assuming it was present at 38 Osborne Street.  Thus, Defendants' assertion that Dormin unequivocally informed Quinn that there was a warrant to seize the Escalade is not an accurate representation of the record.

There is also no record evidence that Defendants had probable cause to seize the Escalade.  Defendants assert, in their memorandum of law, that "it was well known to the law enforcement officials [here] that Prince Hines used the Escalade . . . to conduct drug transactions and meet with his co-conspirators." Defs.' Mem. of Law at 10, Dkt. No. 71.  However, Defendants cite no evidence to support this assertion.  In fact, according to the statements of material fact, the only evidence that Prince used the Escalade to conduct drug transactions is his arrest, some two years before the investigation at issue in this case, where drugs were found inside the vehicle.  Accordingly, the seizure of the Escalade was unreasonable under the Fourth Amendment.

Plaintiffs further allege that Defendants violated Constance Hines's right to notice and an opportunity to be heard under the Due Process Clause of the Fourteenth Amendment when they continued to hold the Escalade for fifteen months and failed to provide her with a hearing or any kind of process to determine whether the vehicle should be returned to her or retained by the City.

In support of their motion for summary judgment, Plaintiffs rely primarily

---

[12] Defendants repeat this assertion in their reply memorandum of law.  See Defs.' Reply Mem. of Law at 7, Dkt. No. 80.

on the "<u>Krimstock</u>" line of cases, commencing with <u>Krimstock v. Kelly</u>, 306 F.3d
40 (2d Cir. 2002) ("Krimstock I"),[13] and <u>County of Nassau v. Canavan</u>, 802
N.E.2d 616, 1 N.Y.3d 134, 770 N.Y.S.2d 277 (2003).[14]  In <u>Krimstock I</u>, the Court
of Appeals for the Second Circuit held that the Due Process Clause requires a
prompt post-seizure, pre-judgment hearing to determine whether, under its civil
forfeiture law, the City of New York was likely to succeed on the merits of a civil
forfeiture action.  <u>See</u> <u>id.</u>, at 68-69.  The New York Court of Appeals, in <u>County
of Nassau v. Canavan</u>, held that "due process requires that prompt post-seizure
hearings be provided to all defendants whose vehicles are seized and held for
forfeiture, not merely those who request them." <u>Id.</u>, at 625.  Defendants' principal
argument in distinguishing those cases is that here, the Escalade was seized as
evidence in the criminal conspiracy case against Prince Hines and his co-
defendants and was not seized for purposes of forfeiture.  Defendants also argue
that it was OAG, not APD, that directed the Escalade be held, and therefore, the
Defendants are not liable on Constance's due process claim.  Finally, Defendants
argue that Plaintiffs were not entitled to notice and an opportunity to be heard
regarding the legality of the seizure of the Escalade until the criminal
investigation was complete.

   To be sure, it is clear from the record here that both OAG and APD were
involved in the seizure and detention of the Escalade.  However, as Plaintiffs
correctly argue, the principles of tort law apply in § 1983 actions, thereby

---

   [13]  <u>See also</u> <u>Jones v. Kelly</u>, 378 F.3d 198 (2d Cir. 2004) ("<u>Krimstock II</u>"); <u>Krimstock v.
Kelly</u>, 464 F.3d 246 (2d Cir. 2006) ("<u>Krimstock III</u>").

   [14]  <u>See</u> <u>Morales v. Dormer</u>, No. 08-CV-4270, 2009 WL 3126276, at *6-11 (E.D.N.Y.
Sept. 29, 2009) for a thorough discussion of the <u>Krimstock</u> cases and <u>Canavan</u>.

rendering Defendants and OAG, at the very least, joint tortfeasors.  See Amato v. City of Saratoga Springs, N.Y., 170 F.3d 311, 318 (2d Cir. 1999).  Accordingly, Defendants cannot avoid liability here based on OAG's involvement in the seizure and detention of the Escalade.

Defendants' argument that Krimstock I does not apply here because the Escalade was seized for evidence in a criminal case and not solely for forfeiture is foreclosed by this court's previous holding that the record evidence fails to support Defendants' contention that there was a warrant or probable cause to seize the Escalade to begin with.  Moreover, it is worth mentioning that in Krimstock III, the Court of Appeals for the Second Circuit noted that "[t]he balance of factors relevant under the Mathews v. Eldridge[15] test weighs in favor of having review by a neutral fact-finder of a prosecutor's decision to retain a vehicle as potential evidence – although no adversarial hearing is required." Krimstock v. Kelly, 464 F.3d 246, 255 (2d Cir. 2006) ("Krimstock III").  Of course, the court went on to explain that an ex parte review instead of a full adversarial hearing would suffice in that instance because the probable cause requirement for the initial seizure further mitigated the risk of an erroneous deprivation.  See id.  Here, again, Defendants have failed to adduce evidence that probable cause existed for the seizure of the Escalade.  In any event, it is worth noting that, even if Defendants held the Escalade as evidence in the criminal case against Prince Hines, some immediate judicial review of the retention was required.

Finally, Defendants argue that Plaintiffs were not entitled to notice and an opportunity to be heard regarding the legality of the seizure of the Escalade until the criminal investigation was complete, relying on City of West Covina v.

---

[15] See Mathews v. Eldridge, 424 U.S. 319, 335, 96 S.Ct. 893 (1976).

Perkins, 525 U.S. 234, 119 S.Ct. 678 (1999).  That case, however, dealt with property that was legally seized for purposes of a criminal investigation pursuant to a state forfeiture law.  Here, the Escalade was seized without a warrant for purposes of forfeiture.  Defendants further argue that the government's interest in a criminal proceeding outweigh the temporary loss of property, citing United States v. One 1978 Cadillac Sedan De Ville, 490 F.Supp.725 (S.D.N.Y. 1980).  That case involved the seizure, pursuant to a valid search warrant, of a vehicle which was used in furtherance of criminal activity with the assistance of its owner.  Here, again, there was no warrant or probable cause for the seizure of the Escalade.  Moreover, Constance Hines was not accused of involvement in the conspiracy regarding which Prince Hines was arrested.

The Krimstock line of cases and Canavan are directly on point here.  Constance Hines's vehicle was seized and held for fifteen months without any opportunity for judicial review of the legality of the seizure.  Accordingly, Constance's rights under the Due Process Clause of the Fourteenth Amendment were violated.  The record reveals that defendants Tuffey, Roberts, Quinn and M. Haggerty were all involved in either the seizure or the continued detention of the Escalade.  Plaintiffs' motion for summary judgment is therefore granted, and Defendants' motion for summary judgment is denied as to those defendants regarding this claim.  However, there is no evidence, nor do Plaintiffs assert, that any or all of defendants Monte, Plante, Martin, Mulligan, T. Haggerty, Hyde and Shunck had any personal involvement in the seizure of the Escalade or the refusal to provide a hearing regarding same.  Accordingly, Defendants' motion for summary judgment is granted, and Plaintiffs' motion for summary judgment is denied as to those defendants on this claim.

Plaintiffs also assert Monell liability on this claim against the City based on

31

Tuffey's actions as a policy-maker for the City.  According to Plaintiffs, Tuffey delegated authority to, and ratified the decisions of, Roberts, Quinn and M. Haggerty, thereby creating an unconstitutional policy to seize vehicles without a warrant and detain said vehicles without providing the owner due process.

"Actions by an individual with final decision-making authority in a municipality constitute official policy for purposes of a § 1983 claim." Anthony v. City of New York, 339 F.3d 129, 139 (2d Cir. 2003) (citing Pembaur v. City of Cincinnati, 475 U.S. 469, 483-84, 106 S.Ct. 1292 (1986)).  Where such an individual is "responsible for establishing final governmental policy[,]" municipal liability will attach.  See id. (quoting Pembaur, 475 U.S. at 483, 106 S.Ct. 1292).  The Court of Appeals for the Second Circuit has instructed that "[w]here an official has final authority over significant matters involving the exercise of discretion, the choices he makes represent government policy.  An official has final authority if his decisions, at the time they are made, for practical or legal reasons constitute the municipality's final decisions."  Anthony, 339 F.3d at 139 (quoting Rookard v. Health & Hosps. Corp., 710 F.2d 41, 45 (2d Cir. 1983).

In order to make the legal determination of whether Tuffey is a final decision-maker for the City, the court must look to state law.  See Jeffes v. Barnes, 208 F.3d 49, 58 (2d Cir. 2000).  Further, where, as here "a plaintiff relies not on a formally declared or ratified policy, but rather on the theory that the conduct of a given official represents official policy, it is incumbent on the plaintiff to establish that element as a matter of law." Id., at 57-58.  Plaintiffs have failed to make that showing here.  Some courts have denied a plaintiff's motion for summary judgment as to municipal liability on the basis of the actions of a final decision-maker where the plaintiff has failed to meet its burden to prove said actor's final decision-maker status as a matter of law.  See Jackson v. Jimino,

No. 1:03-CV-722, 2007 WL 189311, at *19-20 (N.D.N.Y. Jan. 19, 2007);
Iannillo v. County of Orange, 187 F.Supp.2d 170, 187 (S.D.N.Y. 2002).  In those
cases, however, resolution of the legal question of decision-maker status hinged
on resolution of factual questions which were left unanswered in the record.
Here, no such factual resolution is required.  Although Plaintiffs fail to provide
any state law to support their assertion that Tuffey is a final decision-maker in the
area of police department policies regarding the seizure and retention of vehicles,
such support is found in § 58 of the New York State Civil Service Law, which
requires municipalities of a certain population to designate a Chief of Police, that
is "an officer with supervisory authority over the entire police department."  Petri
v. Milhim, 527 N.Y.S.2d 291, 292, 139 A.D.2d 652, 653 (N.Y. App. Div. 1988)
(citing N.Y. Civ. Serv. Law § 58(1-c).  Here, the factual record supports the
conclusion that Tuffey did delegate authority to, and ratify the actions of,
Roberts, Quinn and M. Haggerty regarding the seizure and retention of vehicles.
As Tuffey is a final decision-maker for the City, his actions in this regard have
attached liability to the City regarding Plaintiffs' due process claim.  Accordingly,
Plaintiffs' motion for summary judgment on their due process claim against the
City is granted and Defendants' motion for summary judgment on this claim
against the City is denied.

### 4.  Qualified Immunity

Defendants assert the affirmative defense of qualified immunity as to the
individual defendants in this action.

> [W]hen a defendant official invokes qualified immunity
> as a defense in order to support a motion for summary
> judgment, a court must consider two questions: (1)
> whether the evidence, viewed in the light most
> favorable to the plaintiff, makes out a violation of a
> statutory or constitutional right, and (2) whether that

right was clearly established at the time of the alleged
violation.

Tracy, 623 F.3d at 95-96 (citing Gilles v. Repicky, 511 F.3d 239, 243-44 (2d
Cir.2007); Saucier v. Katz, 533 U.S. 194, 208, 121 S.Ct. 2151 (2001) (modified
by Pearson v. Callahan, 555 U.S. 223, 129 S.Ct. 808 (2009)).

The evidence, viewed in a light most favorable to Plaintiffs, shows that T.
Haggerty, Mulligan, Hyde and Shunck violated Plaintiffs rights to be free from an
unreasonable seizure under the Fourth Amendment.  Also the evidence shows that
Tuffey, M. Haggerty, Roberts and Quinn violated plaintiff Constance Hines's
right to be free from the unreasonable seizure of her property under the Fourth
Amendment as well as her right to due process under the Fourteenth Amendment.

In April of 2006, it was clearly established law that the Due Process Clause
requires a prompt post-seizure, pre-judgment hearing for owners of seized
vehicles.  See Krimstock I, 306 F.3d at 68-69.  Accordingly, Defendants' motion
for summary judgment on the grounds of qualified immunity for Tuffey, M.
Haggerty, Roberts and Quinn is denied.

As for defendants T. Haggerty, Mulligan, Hyde and Shunck, the issue of
whether Plaintiffs' Fourth Amendment right was clearly established in this
instance requires further discussion.  The Court of Appeals for the Second Circuit
has recently summarized the relevant law in this regard.

> In determining if a right is clearly established, this Court
> looks to whether (1) it was defined with reasonable
> clarity, (2) the Supreme Court or the Second Circuit has
> confirmed the existence of the right, and (3) a
> reasonable defendant would have understood that his
> conduct was unlawful.  The question is not what a
> lawyer would learn or intuit from researching case law,
> but what a reasonable person in the defendant's position
> should know about the constitutionality of the conduct.

34

> Moreover, when faced with a qualified immunity
> defense, a court should consider the specific scope and
> nature of a defendant's qualified immunity claim. That
> is, a determination of whether the right at issue was
> clearly established must be undertaken in light of the
> specific context of the case, not as a broad general
> proposition. Thus, the qualified immunity analysis must
> be particularized in the sense that the contours of the
> right must be sufficiently clear that a reasonable official
> would understand that what he is doing violates that
> right. This is not to say that an official action is
> protected by qualified immunity unless the very action
> in question has previously been held unlawful; but it is
> to say that in the light of pre-existing law the
> unlawfulness must be apparent.

Doninger v. Niehoff, — F.3d —, 2011 WL 1532289, at *8 (2d Cir. 2011)

(citations and quotations omitted). Here, again, Plaintiffs have adduced evidence

which, if believed by the finder of fact, would show that defendants T. Haggerty,

Mulligan, Hyde and Shunck detained them in their home, with handcuffs,

pending the application for, and execution of an arrest warrant for the search of

marijuana. Factors which would weigh in favor of the reasonableness of such a

detention, such as the presence of weapons or other persons suspected of gang

activity, were absent. A reasonable police officer, whose job requires knowledge

of procedures to secure premises pending the execution of a search warrant while

preserving the constitutional rights of occupants, should have known that the law

requires consideration of such factors when deciding whether, and in what

manner, to detain those occupants. Of course, it is worth noting that the

defendants have adduced evidence that Plaintiffs were not in handcuffs during

this time and were free to leave the premises while it was being secured pending

the receipt and execution of the search warrant, but chose instead to remain at

their home with the officers. At trial, should the finder of fact credit that

35

evidence, then Plaintiffs will not prevail on their claim.  However, at this stage of the litigation, qualified immunity is not appropriate.  Accordingly, Defendants motion for summary judgment as to Plaintiffs' unreasonable seizure claim against T. Haggerty, Mulligan, Hyde and Shunck based on qualified immunity is denied.

## *V.  Conclusion*

For the aforementioned reasons, it is hereby ORDERED that Defendants' motion for summary judgment (Dkt. No. 71) is GRANTED in part and DENIED in part; and it is further

ORDERED that Plaintiffs' motion for summary judgment (Dkt. No. 77) is GRANTED in part and DENIED in part; and it is further

ORDERED that left for trial as to the issues of liability and damages is Plaintiffs' unreasonable seizure claim against defendants Tim Haggerty, Robert Mulligan, Jeffrey Hyde, and Robert Shunck.  Plaintiff Constance Hines's due process claim against defendants City of Albany, Chief of Police James W. Tuffey, Brian Quinn, Jeff Roberts and Michael Haggerty shall be tried regarding damages only.


IT IS SO ORDERED.

DATED:       July 1, 2011
                     Syracuse, New York



_____
Neal P. McCurn
Senior  U.S. District Judge


36